Good morning, Your Honors. May it please the Court and Counsel. My name is Michelle Christensen. I represent the appellant Eckert-Wordell in this matter. Eckert-Wordell was the architect, as you're aware from reading the documents and the briefing of the parties. This is an appeal, obviously, from the District Court's summary judgment ruling that involved a contract that was entered into between Eckert-Wordell and Family Eye Center, and also involved claims by an entity, a separate entity known as FJM Properties of Willmar, LLC, who is a non-party to that contract between Eckert-Wordell and Family Eye Center. Specifically, FJM was seeking to invoke an arbitration provision in that contract, which it's a non-party. The issues before the Court today are who decides whether the issue of arbitrability applies here and whether that should be the Court or an arbitrator, and also whether Eckert-Wordell is required to arbitrate FJM's claims based on the contract to which it's a non-party. With regard to both of those issues, we would submit that the arbitrability issue is for the Court, not an arbitrator, and that Eckert-Wordell is not required to arbitrate FJM's claims. We believe the lower court erroneously delegated the issue of whether FJM's claims were arbitrable to an arbitrator. First of all, there's a presumption that courts would decide issues of arbitrability. Arbitration, obviously, is a matter of contract, and there has to be consent. Our position is that there was no contract and is no contract between Eckert-Wordell and FJM, and so, therefore, there cannot be any agreement to arbitrate with FJM. When you say there was no contract, are you saying that there's nothing in writing, or was there a contract that was kind of an understanding between the parties? No, there is no contract whatsoever between Eckert-Wordell and FJM. The contract at issue was an AIA contract between the architect, Eckert-Wordell, and the owner who is specified as the architect's client, which was Family Eye Center. Family Eye Center, by the way, was an assumed name that was registered by a different entity known as the Fisher Laser Eye Center, LLC. And you'll see, if you have not read all the briefing yet, that there are multiple entities involved, and the issue about entities is very important to my client. Obviously, there's freedom of contract issues here, which we believe the lower court's ruling contravenes, and the issue about which entity my client contracted with obviously affects my client's rights and obligations. Your client's the architect, and they brought the AIA rules to the table, right? This is one of those standard architect contracts, correct? It is. There were some, I think, changes made during the process, but it's a standard AIA contract. And Family Eye Center, of course, probably doesn't even know that such a thing exists until you bring it to their attention and give it to them. So if there's any doubt at all, shouldn't it be interpreted against your client? Well, both parties had an equal opportunity to read, review, make changes to the agreement. And they had the doctors who were the members of the Family Eye Center, the Fisher Laser Eye Center, LLC, actually had their contractor that they hired, Marcus Construction. Look at the AIA agreement for them. Not a lawyer, I assume. It was recommended that they have it. The contract itself says that. The contractor was not a lawyer. It was an honest question. The contractor was not a lawyer. The contractor was not a lawyer, but the contract itself does say on each of its pages that it's recommended that it be reviewed by an attorney. Even those words were written in the standard contract by the AIA contractor. That's correct. How about the fact, the other sort of equitable sort of point for the other side is, now didn't you end up dealing with about all these doctors and about all their different kinds of practice, and didn't you modify the building for about everybody concerned in the case? Well, there was input given by each of the doctors with regard to the design of the building. But at the end of the day, we have to look at the contract. And the contract was specified to be between my client and Family Eye Center. And some of those doctors were not members of Family Eye Center at the time. Dr. Janning in particular was not. He also was not a member or owner of FJM, which is the party who is seeking to invoke the arbitration. But you modified the building for him, right? Wasn't he the one you modified the building for? There was input from everyone. But that doesn't change the fact of who the contract is with. And if that had been the case, the doctors clearly could have asked to change that, and that never happened. And now, 10 years later, we're looking at a contract that only exists between Family Eye Center and Eckert-Wardell. Well, what about, you're familiar with the contact case. Yes. Why doesn't the contact case say that when we get these kind of cases, and they're bound to happen all the time with all the entities and all the contractors playing lawyer, and that kind of thing, which it says, we let the arbiter first look at this and just see how it plays along with everything that was going out in the deal. So why does the contact case not apply here? Well, the facts in contact are obviously different than we have here. Contact involved two signatories to a contract. Their corporate forms changed over time, but essentially this court, or the Second Circuit, I'm sorry, determined that contact was essentially the same party as had originally contracted. So you had an arbitration agreement between two signatories. Two other facts that the court found very important to its decision in that case is the fact that they continued to work with each other, and they continued to treat each other as if they were subject to that contract, regardless of the changes in the corporate form of the entities. It's different than what we have here. FJM and Family Eye Center, which is, again, Fisher Laser Eye Center, LLC, were specifically formed by the doctors as separate legal entities to have separate legal obligations and rights. My client, Eckert Wardell, never dealt directly with FJM with regard to the design of the project. Apparently, FJM had been formed even before the contract with my client was signed, using a different name, which was Family Eye Properties, LLC. So the name FJM didn't even exist at the time of the contract with my client. What about the Apollo First Circuit case? You know, that's with the bankruptcy trustee case. Right, and in that case— And they said, we can't arbitrate with that. People say that's a completely unfair arbitration because this is not only a non-signatory, they've got all kinds of other powers too. Right. And the First Circuit done bad and I. It says too bad, so sad, arbitrate. Right, and in the Apollo case, that's where— excuse me while I find my note on that case. In that case, the agreement was between Apollo and a company called DECO. Apollo actually sued DECO, and that's another point I just want to raise briefly. In all of these instances, we have an actual signatory to an arbitration agreement suing a non-signatory or another signatory, and then that defendant seeking to enforce the arbitration. We have the opposite here. We have a non-party, non-signatory to the agreement seeking to enforce arbitration against a signatory to the agreement. So that, I think, is important because we see that kind of over and over with regard to the— That's the wholesale grocery case, huh? That's the wholesale grocery case. Okay, well, that's an easy case in this circuit. You can arbitrate that, right? It is. And it's a Minnesota case? It is a Minnesota case. What do you say to wholesale grocery if we get that far down the road? Well, wholesale grocery, I think the reason that the court decided that you couldn't compel arbitration in that case is because the claims involved antitrust claims, which they didn't believe— the court didn't believe arose out of the agreement at play. Here, there's no anticipation between Eckert-Wardell and Family Eye Center that Family Eye Center would enter into some separate agreement with FJM. So we don't believe that particular case applies. I think the court says in wholesale, are the person's wrongs and issues involved closely related? I think that's the bottom line, and this is a matter of federal law, is I think what the court says. That's correct. So doesn't that apply here, wholesale grocery? It's just last year. Well, except that, again, we don't have the interrelationship between the parties here. We don't have FJM having any relationship with Eckert-Wardell, and we have two separate entities formed by the doctors which really don't have any relationship either to the contract. FJM's not mentioned in the contract. It's not a part of the contract. It's a separate entity completely with different legal rights and obligations. And the doctors were aware that at the time they formed it, and they either chose or failed to choose to have Family Eye Center named rather than FJM. Well, it seems to me that the issue that one of the issues we have to resolve here is that if you look at wholesale grocery, CD partners, we have a whole line of cases that say a non-signatory to a contract can force the signatory, and there's no question your client's a signatory, into arbitration as long as there's a close relationship, right, between the non-signatory party and the signatory. That's correct. And so then somebody has to decide whether there's a close relationship, and you're, of course, arguing there isn't, and the other side's going to argue and come up and say there is. So the question is, who decides that? And it seems to me that under our Fallow case, that's for the arbitrator. They have to decide what their own jurisdiction is and who has a right to be in front of them once they determine that there is an arbitration clause. Well, one thing that I think we have to take a look at here first is, with regard to the close relationship issue, most of the cases where you're going to find that a non-signatory is entitled to enforce an arbitration agreement, the non-signatory essentially could stand in the shoes of the signatory. We don't have that here. There are no facts suggesting that FJM could stand in the shoes of Family Eye Center or Fishery Laser Eye Center LLC. They are separate legal entities. FJM is not a successor. But I could sit here and make the argument that the other side is going to make, which is going to be basically the same people, they have the same mailing address, it's the same clinic, it's the same subject matter of the dispute. Same building. Same building. That's always a big issue. It's the same subject matter. It's the same whether it's the Family Eye Center. It's the same. It's exactly the same dispute. I presume you'll have exactly the same defenses if there are any. I mean, you can sit here and you can put your list of arguments and their list of arguments, and somebody's got to decide. And it seems to me under a FAML case, we've said the arbitrator is the one who decides that. Since you incorporated the AAA rules, now you've got to have the AAA rules. That's correct. But the contract that we have here, you have to look specifically at the language of that. You can't disregard and just in the haste to favor the judicial policy for arbitration, you can't overlook the clear language of the contract. And that contract specifically says that arbitration applies to claims between the parties. And I believe that's Section 7.2.2 of the contract. And it says, Any claims or matters between the parties that aren't resolved by mediation shall be decided by arbitration. And that's where we see the incorporation of these AAA rules, which, again, you'll hear FJM argue means that all issues need to go to the arbitrator. We can overlook that. The Iraq case, which we cited out of the Second Circuit, which came out after the contact case, specifically says that you have to look at the language of the contract. Again, arbitration is a matter of contract. And so to the extent that a signatory may agree to arbitrate with another signatory to the contract, that doesn't necessarily mean that they've agreed to arbitrate with a non-signatory to the contract. That's an issue that's raised, and practically every one of these cases will have that issue in it. But the language of all the cases is not the same. A lot of the cases that you see where the non-signatories are allowed to arbitrate or invoke an arbitration clause involve very broad language. It says all claims or all matters are subject to arbitration, and then they incorporate some arbitral rules such as AAA. We don't have that here. This contract specifically states that it just matters in question between the parties. And again, that would be Eckert-Wardell and Family Eye Center. And I think I'll reserve the rest of my time for rebuttal. Thank you. Thank you very much. We'll next hear from Mr. Buterin. Good morning, Your Honors. Counsel, may it please the Court, my name is Steve Buterin, and I'm here on behalf of Respondent F.J.M. Properties of Willmar, Inc. to ask that this Court affirm the District Court's decision that the arbitrability of F.J.M.'s claims must be decided by the arbitrator in the first instance. To draw on Counsel's last point that the contract language here is not broad, it is. The contract specifically provides that any claim, dispute, or other matter in question arising out of or related to this agreement shall be subject to arbitration. That is in the contract that was signed that contains the arbitration clause, and there's no dispute. Eckert-Wardell does not dispute the existence of the arbitration clause, the existence, or that it explicitly incorporates the AAA rules. And the AAA rules specifically grant the arbitrator the power to decide issues relating to the existence, validity, and scope of the arbitration agreement. And that's the issue here. Counsel, they do have one different bit of wording in this contract. No arbitration arising out of or related to this contract shall include any additional person or entity, not a party. Now, I don't think that was in the wholesale groceries case. I could be wrong. I don't think it's in most of these cases. Now, does that make this a different case? It does not, because that question goes to the arbitrability of F.J.M.'s claim, and that is a question for the arbitrator, and that's an open question. The arbitrator gets to decide. Perhaps that provision applies and excludes or prohibits F.J.M. from arbitrating or forcing Eckert-Wardell to arbitrate the merits of the claim, the substance of the claim. But the initial decision as to who gets to decide whether there are arbitrable claims or not is left to the arbitrator, because this contract specifically incorporates the AAA rules. And under this Court's decisions that I cite, Fallow, Green, Wooten, FSC, this Court has held that where parties incorporate rules such as the AAA rules that grant the arbitrator the power to decide his or her jurisdiction and issues relating to the existence, scope, and validity of the arbitration agreement, that goes to the arbitrator, not the Court. So you say to accomplish what they wanted to accomplish, they not only needed that clause, but they needed to expressly exclude the AAA rules about parties. If they had done the rules and that provision, then would they have won? In that case, perhaps they would have won. But what we're left with here in this contract is the fact that it's not disputed by Eckert-Wardell. Nowhere do they address this issue in their opening brief or their reply brief. They do not contest that the AAA rules are incorporated and that those rules specifically grant the arbitrator the power to decide issues of arbitrability. And there is a sufficiently close relationship between FJM and Family Eye Center that it doesn't do violence to the agreement to have the arbitrator decide issues of arbitrability. The parties are the same. The doctors are the same. FJM is the owner of the land and the building that Eckert-Wardell designed. Eckert-Wardell is being, the dispute involves its design of the very building that's at issue in the contract. So this isn't a situation where Eckert-Wardell is being forced to arbitrate claims with strangers or claims that are unrelated to the contract that contains its arbitration clause. There's a very strong relationship between the parties, the issues, and the claims. As I understand it, Family Eye Properties LLC, which became FJM Properties, was in existence at the time the contract was signed? I believe so, yes, Your Honor. And it had been incorporated, or it had been established specifically to build the clinic, right? Right. Does the record contain any information as to what information, if any, was conveyed to Eckert-Wardell as to who the true owner of the building was, or is there anything as to why the contract is with Family Eye Center, which was not the record owner, versus the LLC? Well, as Judge Kyle recognized in his opinion, I believe in a footnote, is that the Family Eye Center was the name that the doctors used for their practice. These are small-town doctors that simply used the name Family Eye Clinic, and they didn't think much of it. That's what their testimony indicates. I don't know the specific deposition sites, but they didn't give any thought to it. They just thought of themselves as Family Eye Center, and that's why they used that name at that time. And it's important to note that Eckert-Wardell was the one that drafted the contract. Well, they didn't really draft it. They just picked it off the shelf, right? This is the standard AIA stuff all put together, right? Standard AIA contract, but standard AIA contracts, and I handle these on a regular basis, they require input. By the way, your client at that time didn't have counsel, right? I don't believe so. Right. Neither party had counsel, right? And they both took the form contract? Right. With the statement on every page, hire lawyer. It does say hire lawyer on every page. It does. And there is cautionary language. You deal with it all the time. I believe it's in the upper right-hand corner. That's where it is on AIA contracts. But Eckert-Wardell prepared the contract. To have an AIA standard form contract, you need a license with the AIA. Who had that license? Well, that was Eckert-Wardell. What do you mean there? Because people copy them out of the books all the time. So help me with what you mean. You have to be? Well, typically, if you have the software to prepare AIA contracts, you need a license. Can you do it without? Could they just sit down and say, let's just set this aside here, let's build our own contract? They could, but they didn't. They used a copyrighted AIA contract. But the important point is that Eckert-Wardell was the party that filled out the blanks in that contract, and they listed Family Eye Clinic as the owner of the project. I guess I'm going to ask, and I don't know if it's important, but anything in the record is whether Eckert-Wardell knew at the time they were doing the work for him that the legal owner was someone other than Family Eye Center. I mean, did Family Eye Properties LLC have its own bank account? I presume they probably did. Some lawyer must have told them if you're going to have a separate entity, you ought to make sure that that's where the money comes from for the architects and contractors and stuff. I mean, is there anything in the record about that? The record does reflect that I believe it was Dr. Janning paid $100,000 to Eckert-Wardell under this contract, and he is not named as a party. So Eckert-Wardell was certainly willing to accept money from one of the principals of Family Eye Clinic and FJM, but now it wants to run away once its design is called into question. So there is some record that Eckert-Wardell knew that others were involved, and it specifically took input from all the doctors involved, including Dr. Janning, who I believe was not at the time a part of Family Eye Center when the contract was entered into. But Jeff Eckert sat down with him and the other doctors and received input from all the doctors involved as to the design of the project. So Mr. Eckert knew exactly who he was dealing with. There are no new people. You mean in terms of the flesh in front of him he knew, but he didn't know anything about the legalities of who he was dealing with? Well, I'm not sure. Well, what does the record show about the legalities? Did he know about corporations, LLCs, who owns land, who owns a building? I took the record silent on that. I'm trying to think. I can't recall of any specific testimony where he goes into his knowledge of the legalities of who he's dealing with. But it's important to note that as this case progressed, Eckert-Wardell brought an arbitration claim against Westec, the contractor, and in their notice of claim they specifically state that Eckert-Wardell hired Westec Design to perform the design and installation of the 8-track system in FMJ Properties LASIK Surgery Center in Willmar, Minnesota. That's at Appendix 127.  That was filed. The date on that is... I'm drawing a blank on the date here. Because there's some indication in the record that Eckert-Wardell claims that you tricked them and deceived them as to who the true owner was. Eckert-Wardell, they wrote the contract. I mean, I'm talking about the time of the arbitration that you tricked them and that's the reason that they went for two and a half years. No. As Judge Kopp pointed out, they were certainly capable of picking up the contract and looking at who the parties were to the contract. It didn't take two years for them to read the contract. Eckert-Wardell had sophisticated counsel. They were certainly capable of understanding who or whether there were questions as to who they had contracted with. But again, all these questions go to the arbitrability of FJM's claims. Under this court's case law and the contact decision out of the Second Circuit and Apollo out of the First Circuit, those questions, as Judge Keil recognized, go to the existence, validity, and scope of the arbitration agreement. That, both Judge Keil and the arbitrator recognized, is an open question. The questions as to whether FJM as a non-signatory can enforce the arbitration clause, that again goes to the central question of whether . . . under this court's precedent, goes to the arbitrator because, in this case, there's no dispute the contract incorporates the AAA rules. And the contract also has broad arbitration language. It goes to any claim or dispute that arises out of or is related to the agreement. FJM's claims are directly related to the agreement because they go to the professional negligence of Eckert-Wardell in designing the I-Center. Another key point to keep in mind is that in the state court action, Eckert-Wardell admitted that it had a contract with FJM Properties and that it performed architectural services for FJM Properties. When the arbitration started to get going and the state court case had been filed, FJM and Eckert-Wardell entered into a tolling agreement. That tolling agreement specifically recognizes that Eckert-Wardell was bound by contract to arbitrate claims with FJM and that they also agreed to private arbitration under the CRP rules of FJM's claims. Those rules are almost identical to the AAA rules and provide that the arbitrator has the jurisdiction and is to decide any threshold issues of arbitrability. And so Eckert-Wardell, on this record, clearly understood or believed that it had a contract or was dealing with FJM Properties and that nothing was amiss. And it proceeded for two years, almost three years, to arbitrate its claim and then only a month before then claims that it didn't realize who it was dealing with. But whether it's Family, I-Center, or FJM, Eckert-Wardell would be dealing with the same individuals on the other side of the table, the same issues, and the same claims. This might not be a real material question, but what were the big complaints here? Was it the design of the building? Was it the size of the rooms, the height of the ceilings, the look on the outside? What was really what got everybody's dander up in this case? There were issues with the HVAC system, and that was the main claim was that it was negligently designed. I believe there should have been four air handling units. There were only two. But the parties haven't gotten into that issue in terms of litigation arbitrating, so those claims haven't been fully developed. But that's in essence what it was, issues with the HVAC system. Briefly, Your Honors, Eckert-Wardell has presented no compelling reasons for this court to walk away from its decision in green, fallow, wooten, or from contact. The issue of arbitrability, the existence, scope, and validity of the arbitration agreement in this case is for the arbitrator to decide and not the court in the first instance. Thank you. Thank you very much. How much time? This is an important case for your clients, so we'll give you two. How does that sound? Thank you. I appreciate that, Your Honor. What is your response to the fact that you waited two and a half years and in more than one pleading admitted that there was a contract and you were subject to arbitration? Well, what I'd point out with regard to that, Your Honor, is that FJM also had sophisticated counsel who wrongly alleged, erroneously alleged, for going on three years that FJM was the party who had contracted with Eckert-Wardell. So we have kind of dueling admissions here or inconsistent. Well, theirs isn't inconsistent. They've always taken the position that they're parties to the contract and they're subject to arbitration. No, actually, FJM initially alleged that it was the party who hired and contracted with Eckert-Wardell and only in the context of the lower court discovery and pleadings and motions did FJM finally concede that it is not a party to the contract. It is rather simply a non-signatory, non-party to the contract. So their allegations have changed significantly over time. So what we do with that, Your Honor, I don't know. But the answer that we proposed, and that was simply to the state court lawsuit, which was stayed and never dealt with again because the parties believed they had an arbitration agreement, was based on the information available at the time. I don't think anybody had the contract in hand. Even when they did, there was no reason to believe that Family Eye Center hadn't simply changed their name to FJM. And that's what the owner of Eckert-Wardell actually testified to. You asked if there was any evidence in the record that Eckert-Wardell knew about all these various entities and who the true owner of the land or the building was. He did not. It's Jeff Eckert's deposition. He was asked those questions, and he said he'd never heard of Family Eye Properties. The doctors had specifically talked about maybe developing different entities, one to rent or lease the building practice back to the other one. But Eckert-Wardell wasn't involved in those discussions or the formation of the various entities. Finally, Your Honors, we just believe that we don't have the same claims or issues here involving the entities. It is important that we have the opportunity to respond to claims by each entity, and that that would be something that we can't do and we would be subject to duplicitous claims here potentially if FJM is not happy with its result if we're forced to arbitrate. Thank you. Thank you very much. The case has been well presented by both sides, and we will take it under consideration and render a decision in due course, and we thank you both for your attendance here this morning. You both did a good job in presenting your sides. Madam Clerk, the next